UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS ROBERTS,
o/b/o C.J.R., a minor,

    *Plaintiff*,

v.                                    CASE NO. 12-CV-15303

COMMISSIONER OF              DISTRICT JUDGE STEPHEN J. MURPHY, III
SOCIAL SECURITY,               MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff's minor child, C.J.R,[2] is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

[2] The Complaint refers to the minor plaintiff by her full name, and therefore so does the Court's docket. However, the minor should have been referred to as "C.J.R.," since Rule 5.2(a)(3) of the Federal Rules of Civil Procedure prohibits the use of a minor's name and requires that only a minor's initials be used.

## II. REPORT

### A. Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for supplemental security income ("SSI") benefits for Plaintiff's minor child. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 11, 13.)

Plaintiff's daughter, C.J.R, was 20 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 33.) Plaintiff filed the instant claim on May 8, 2009, alleging that C.J.R.'s disability began on October 7, 2008. (Tr. at 12.) The claim was denied at the initial administrative stages. (Tr. at 63.) In denying the claims, the Defendant Commissioner considered affective disorders and migraines as possible bases of disability. (*Id.*) On March 8, 2011, C.J.R. appeared before Administrative Law Judge ("ALJ") Phillip C. Lyman, who considered the application for benefits *de novo*. (Tr. at 9-62.) In a decision dated April 12, 2011, the ALJ found that C.J.R. was not disabled. (Tr. at 25.) Plaintiff requested a review of this decision on May 5, 2011. (Tr. at 7-8.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when, after review of additional exhibits[3] (Tr. at 114, 549-70, 571-73), on September 27, 2012, the Appeals Council denied Plaintiff's request

---

[3]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

2

for review. (Tr. at 1-6.) On December 3, 2012, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B. Standard of Review

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v.*

*Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, the court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of the court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

4

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

### C. Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II, 42 U.S.C. § 401 *et seq.*, and the Supplemental Security Income Program ("SSI") of Title XVI, 42 U.S.C. § 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

5

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

A child will be considered disabled if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations . . . ." 42 U.S.C. § 1382c(a)(3)(C)(I). To determine whether a child's impairment results in marked and severe limitations, Social Security Administration ("SSA") regulations[4] prescribe a three-step sequential evaluation process:

1. If a child is doing substantial gainful activity, the child is not disabled and the claim will not be reviewed further.

2. If a child is not doing substantial gainful activity, the child's physical or mental impairments will be considered to see if an impairment or combination of impairments is severe. If the child's impairments are not severe, the child is not disabled and the claim will not be reviewed further.

3. If the child's impairments are severe, the child's impairment(s) will be reviewed to determine if they meet, medically equal or functionally equal the listings. If the child has such an impairment and it meets the duration requirement, the child will be considered disabled. If the child does not have such impairment(s), or if the duration requirement is not met, the child is not disabled.

20 C.F.R. § 416.924(a). In the third step – namely, whether a child's impairment functionally equals the listings – the Commissioner assesses the functional limitations caused by the child's impairment(s). 20 C.F.R. § 416.926a(a). The Social Security regulations list specific impairments relevant to step three, some of which apply only to children. *Id.* § 416.924(d). A claimant bears the burden of proving that his or her impairment satisfies, or "meets," one of the listed impairments. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir.1995); *see also Hall ex rel. Lee v. Apfel*, 122 F. Supp. 2d 959, 964 (N.D. Ill. 2000) (child's claim). Once a claimant makes such a showing, an

---

[4]For a history of these regulations, see *Molina v. Barnhart,* No. 00-CIV-9522(DC), 2002 WL 377529 (S.D.N.Y. March 11, 2002).

irrebuttable presumption of disability arises and benefits must be awarded. *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).

To "meet" a listed impairment, a child must demonstrate both "A" and "B" criteria. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. "A" criteria are medical findings and "B" criteria "describe impairment-related functional limitations." *Id*. An impairment that shows some but not all of the criteria, no matter how severely, does not qualify. *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995); *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). If a child's impairments do not "meet" a listed impairment, they may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment. 20 C.F.R. § 416.926a(a). A child's impairments "equal" a listed impairment when the child demonstrates a "'marked' limitation[ ] in two domains of functioning or an 'extreme' limitation in one domain." *Id*.

Domain analysis is equivalent to analysis of the "A" and "B" criteria for listed impairments and focuses on "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The regulations include six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. *Id*. A "marked" limitation is one which "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(I). It "is 'more than moderate' but 'less than extreme.'" *Id.*

### D.     ALJ Findings

The ALJ applied the Commissioner's disability analysis described above and found at step one that C.J.R. was born on September 21, 1990, and therefore had not attained age 22 as of October 7, 2008, the alleged onset date, and that she had not engaged in substantial gainful activity

7

since October 7, 2008, the alleged onset date. (Tr. at 14.) At step two, the ALJ found that C.J.R.'s depression involving chronic daily headaches and myalgias were "severe" within the meaning of the second sequential step. (Tr. at 14-18.) At step three, the ALJ found no evidence that C.J.R.'s combination of impairments met or equaled one of the listings in the regulations. (Tr. at 18-20.) At step four, the ALJ found that C.J.R. had no past relevant work. (Tr. at 24.) At step five, the ALJ found that C.J.R. retained the residual functional capacity to perform a limited range of light work. (Tr. at 21-24.) Therefore, the ALJ found that C.J.R. was not disabled. (Tr. at 24-25.)

### E. Administrative Record

A review of the medical evidence of record indicates that C.J.R. underwent surgical removal of a left cholesteratoma at John Providence Hospital in October 2008. (Tr. at 115-30, 133-57.)

C.J.R. was also treated at McKenzie Memorial Hospital from March to April of 2009 for headaches and a swollen tongue. (Tr. at 131-45.) It was noted that C.J.R.'s father was "concerned" about C.J.R. having the same fate as his wife who "died at age 38 from similar problems[,]" i.e., headaches for which no diagnosis was made. (Tr. at 133.)

C.J.R. was treated by John Zappia, M.D., from September 2008 to March 2009. (Tr. at 146-57.) C.J.R. was also treated at the Deckerville Healthcare Services and Deckerville Community Hospital from April 2008 to April 2009. (Tr. at 158-256.) C.J.R. reported tension or nauseated headaches from 2008 onward. (Tr. at 219-23, 225-28, 231-32, 250-52.) An MRI of Plaintiff's cervical spine taken on February 2, 2008, showed "early degenerative disc phenomenon from C2 to C7," but was otherwise normal. (Tr. at 233.) On February 19, 2009, C.J.R.'s prescription for Prozac was refilled, noting anxiety/depression symptoms. (Tr. at 216.) On April 23 and 30, 2009, CT scans of C.J.R.'s abdomen and pelvis were negative, a scan of her entire spine was largely

normal (showing a "[r]eversal of the cervical lordosis" and "slight anterior wedging of the thoracic and vertebral bodies"), a scan of her head was normal, and x-rays of her chest were negative. (Tr. at 259-60.)

C.J.R. sought treatment on June 12, 2009, for "right shoulder and right elbow pain." (Tr. at 182-83.) It was noted that "in the past [C.J.R.] did complain of headaches. A CT scan of the head was done and it was negative." (Tr. at 182.) C.J.R.'s right extremity was examined, and it "showed no swelling, edema, or redness. There was full range of motion of the shoulder and elbow. Motor power was very good. There was no tenderness over the elbow or shoulder" and C.J.R.'s "deep tendon reflexes, sensations, and cranial nerves [were] intact and symmetrical." (Tr. at 183-84.) X-rays of C.J.R.'s right shoulder, right elbow, and cervical spine were all normal. (Tr. at 192-94.)

C.J.R. was treated at Mayo Clinic in April 2009. (Tr. at 257-85.) When C.J.R. was evaluated for restless leg syndrome, J.G. Park, M.D., concluded that C.J.R. "fulfills the clinical criteria for restless leg syndrome in that she experiences restless dysthesia worse at night or during prolonged immobilization with the urge to move the legs." (Tr. at 266.) In addition, Dr. Park diagnosed daytime somnolence and he "suggested that spending too much time sleeping will also impact her sleep quality, resulting in worsening daytime symptoms . . . [so] I suggest she should be active and play with her dog or otherwise . . . I also suggest that she try to reduce her nighttime sleep to no more than eight hours. Hopefully, by reducing the total sleep time, she will find it easier to initiate sleep as well as improve her sleep quality . . . ." (*Id.*)

C.J.R. was also evaluated by W. Sanchez, M.D., for abdominal pain. (Tr. at 267-69.) Dr. Sanchez was unable to diagnose any cause of the pain. (Tr. at 268.)

9

C.J.R. was evaluated by A.Y. Joshi, M.B.B.S., and Gerald Volocheck, M.D., for angioedema. (Tr. at 270-72.) It was noted that "[a]bout five years ago, the family ate at Red Lobster one night, and the next morning she woke up and by mid-day she couldn't talk [because h]er tongue was enlarged and she had difficulty breathing." (Tr. at 270.) Another episode occurred on March 4, 2009, and the physicians opined that "she might have decreased potassium which could have caused these symptoms, but no specific diagnosis was made." (*Id.*) Dr. Volocheck was "unclear for the underlying etiology for her episodic angioedema." (Tr. at 272.)

C.J.R. was evaluated for headaches by C. Shin, M.D. (Tr. at 273-74.) Dr. Shin noted that the "MRI scan of the head shows normal brain parenchyma and no evidence of vascular processes." (Tr. at 273.)

C.J.R. was also evaluated for depression by J. Bhagia, M.D. (Tr. at 275-78.) Dr. Bhagia diagnosed major depression (single episode, moderate) and assessed a GAF score of 58. (Tr. at 277.) Dr. Bhagia noted that he "[d]iscussed with patient's parent and patient with regard to counseling as the key thing for her to get better . . . [because she h]as been angry about the death of her mother . . . [and s]he needs to work on it and grieve about it as well." (*Id.*) Dr. Bhagia spoke with C.J.R.'s father and "discussed that with regards to [C.J.R.'s] functioning that we cannot continue to have her just sleeping most of the time and not functioning and to work either initially on an outpatient basis with a psychiatrist, a mentor, a psychologist, and possibly a case manager from the county to help her." (Tr. at 285.)

C.J.R. sought treatment for depression with the Sanilac County Community Mental Health from December 2006 through June 2009. (Tr. at 286-323.) C.J.R. was also treated at the East Bay Medical Center from March 2008 through June 2009. (Tr. at 324-65.)

On June 26, 2009, C.J.R. underwent an EEG which was "mildly abnormal [] due to increased amount of fast, low-voltage beta activity," which "could be seen as a physiological effect of medication . . . ." (Tr. at 377.)

C.J.R. was also treated at the Michigan Head Pain and Neurological Institute from June to July 2009. (Tr. at 366-87.) On June 26, 2009, Alicia R. Prestegaard, M.D., stated that, "[i]n my opinion, [C.J.R.] suffers from intractable migraine headaches and fibromyalgia syndrome." (Tr. at 382.) On that same day, Jeffrey Pingel, Ph.D., evaluated C.J.R. and diagnosed pain disorder associated with both psychological factors and a general medical condition, as well as major depressive disorder (recurrent, mild severity). (Tr. at 386.) As one of his treatment goals, Dr. Pingel stated that C.J.R. should "[i]ncrease participation in activities of daily living including academic and employment activity." (*Id.*) Dr. Pingel reiterated that he recommended that C.J.R. "engage more actively in educational and employment pursuits." (Tr. at 387.)

Dr. Prestegaard recommended in-patient evaluation and C.J.R. was admitted to Chelsea Community Hospital from July 20 to July 31, 2009. (Tr. at 388-423.) It was noted that x-rays of C.J.R.'s chest, CT of the head, MRA of the neck and brain, MRI of the brain, and MRV of the brain were all normal, but that an MRI of the cervical spine showed "early degenerative disc phenomenon from C2 to C7." (Tr. at 390-91.) It was further noted that C.J.R.'s physical examination and laboratory tests were all normal except for "positive fibromyalgia tender points, and occipitocervical junction tenderness bilaterally." (Tr. at 390.) On July 21 and 22, 2009, C.J.R. underwent occipital nerve blocks with steroids. (Tr. at 369, 371.) C.J.R.'s discharge instructions contained no restrictions on activity and encouraged C.J.R. to "[g]radually resume normal activities including the physical aspects of farming." (Tr. at 392.)

11

A Psychiatric Review Technique was completed on August 27, 2009, by Zahra Yousf, M.D.. (Tr. at 424-37.) Dr. Yousf diagnosed affective disorders, i.e., major depression. (Tr. at 424, 427.) Dr. Yousf concluded that C.J.R. was moderately limited in her activities of daily living and in maintaining concentration, persistence or pace but was only mildly limited in social functioning. (Tr. at 434.)

A Mental Residual Functional Capacity ("RFC") Assessment was completed on August 27, 2009, by Dr. Yousf. (Tr. at 438-40.) The assessment concluded that C.J.R. was moderately limited in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods, and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, but was otherwise not significantly limited in understanding and memory or sustained concentration and persistence. (Tr. at 438-39.) The assessment also found that C.J.R. was moderately limited in her ability to interact appropriately with the general public and the ability to set realistic goals or make plans independently of others, but was otherwise not significantly limited in social interaction and adaptation. (Tr. at 439.) The assessment concluded that the "totality of evidence in the file indicates that the claimant retains the mental capacity to meet the basic demands for simple unskilled work." (Tr. at 440.)

A Physical RFC Assessment was completed on September 1, 2009, by William Joh, M.D. (Tr. at 443-50.) The assessment concluded that there were no exertional limitations, postural limitations, manipulative limitations, visual limitations, communicative limitations, or environmental limitations established. (Tr. at 444-47.)

C.J.R. was again evaluated at Mayo Clinic from June 28 to July 9, 2010. (Tr. at 451-63.)

12

A Medical Assessment of Ability To Do Work-Related Activities was completed by Subair Shaikh, M.D., on February 18, 2011. (Tr. at 546-48.) Dr. Shaikh indicated that he had been treating C.J.R. for migraine headaches, depression/anxiety, fatigue, insomnia, IBS, obesity, neck pain, and diffused myalgias on a monthly basis since June 2006. (Tr. at 546.) Dr. Shaikh opined that C.J.R. can lift/carry 20 pounds occasionally and 10 pounds frequently, stand or walk about 6 hours of an 8-hour day for 30 minutes at a time without interruption, and can sit for 8 hours in an 9-hour workday for 30 minutes at a time without interruption. (Tr. at 546-47.) Dr. Shaik also stated that C.J.R. should not be required to reach overhead for 7 hours of the 8-hour workday. (Tr. at 547.) Dr. Shaikh opined that C.J.R. would need to take unscheduled breaks during the day every two hours for 15 minutes and that she would be likely to be absent from work more than 4 days per month. (*Id.*) Although Dr. Shaikh indicated that C.J.R. could perform all the listed activities occasionally and could frequently hold her head in a static position, he indicated that C.J.R.'s symptoms would interfere with her attention and concentration to perform even simple work tasks "constantly." (Tr. at 548.) The only "medical findings" listed on the evaluation were that C.J.R. "reports subjective pain throughout body. Deconditioning to activity level. 18/18 tender points on exam." (Tr. at 546.)

In the Third Party Function Report, C.J.R.'s father indicated that C.J.R. has no problem with personal care, does laundry when possible, and does chores weekly when able. (Tr. at 96-98.)  He also commented that

> Her mother passed away April 17th, 2004. [C.J.R.] is showing signs of the exact same problems that took her mother's life. The doctors never did figure out exactly what was wrong. I really hope [C.J.R.] does not end up the same way.

(Tr. at 103.)

At the administrative hearing, a medical expert in psychiatry and neurology, Dr. Martin Macklin, testified that he evaluated C.J.R.'s medical records and considered two Listings, 12.04 (affective disorders) and 12.07(somatoform disorder). (Tr. at 35.) Dr. Macklin indicated that the "B" criteria could not be satisfied under either Listing. (Tr. at 35-37.) When asked by C.J.R.'s counsel what causes C.J.R.'s headaches, Dr. Macklin responded, "She has the symptoms of her mother . . . I'm not questioning whether they can interfere or not . . . they can have some interference certainly, but when I look at some of the records, for example, 7F, she - - there's nothing in there. This is the mental health clinic records. It doesn't sound like she's having any real functional difficulty and then when I look at the Michigan Pain and Head Center record the final assessment's saying that she socialized quite well with the folks there and didn't seem to have a great deal of difficulty in functioning. So it's - - hard for me to assess." (Tr. at 40-41.)

C.J.R. testified that she drives a vehicle but "[n]ot very far[,]" i.e., "[a]bout three to 20 miles." (Tr. at 42.) C.J.R. indicated that she lives with her father who is a farmer in Deckerville, Michigan, that she has never been married, and that she does not have any children. (Tr. at 42-43.) Prior to her mother's death in 2004, C.J.R. lived with her mother in Hope Lake, Michigan. (Tr. at 43-44.) When asked what stops her from being able to work, C.J.R. responded, "the pain causes me to have blurred vision and . . . outlines - - mostly everywhere but the worst parts is in my neck and head." (Tr. at 44.) C.J.R. added that "[p]retty much every muscle in my body hurts. I've been diagnosed with fibromyalgia as well." (Tr. at 45.) C.J.R. stated that "the only thing I do with my friends is pretty much talk to them on the computer." (Tr. at 46.)

C.J.R. testified that after her mother died, her maternal grandmother "abandoned me, really . . . [s]he didn't want anything to do with me. She had cancer so she pretty much ignored me after that." (Tr. at 47-48.) When the ALJ asked C.J.R. how her grandmother could have done much if

14

she was battling cancer, C.J.R. responded, "Well, she was - - after the fact we figured out that she was going to the casino every week and she could have picked up the phone when we called." (*Id.*) C.J.R. also stated that her father is "pretty much the only solid rock I have in my life - - besides my dog . . . ." (Tr. at 48.)

C.J.R. testified that she has head pain every day and that the pain "varies but never goes below a six." (Tr. at 50.) C.J.R. stated that the Botox shots made her muscles more tender and did not work to help her headaches. (Tr. at 54.)

The ALJ asked the Vocational Expert ("VE") to assume a person with C.J.R.'s background who had a

> lift and carry capability of 20 occasionally, 10 frequently. A stand and walk of six hours a day, a sit of - - let's call that up to six hours a day. A sit of six hours a day. Posturally stairs and ramps are occasional, ladders, scaffolds and ropes never, balance is occasional, stoop, crouch, kneel and crawl each are occasional. Attendance-wise this person will miss more than four times a month, unscheduled breaks this person will need up to two hours per day. Manipulative limitations all are frequent bilaterally, that's reaching, handling, and fingering.
>
> Communication limitations there are none, hearing, seeing and speaking.
>
> * * *
>
> Environmental no heights and what kind of medication are we taking.
>
> * * *
>
> No machinery . . . .

(Tr. at 56-58.) The VE responded that "there are certainly many jobs that fit those physical parameters of the light hypothetical except we have a person who's going to miss four days a month, we have a person that's not able to work an eight hour day without taking two hours of breaks and given those facts I would say there would no be jobs available in the martketplace for that individual." (Tr. at 59.) The ALJ then asked the VE to consider a second hypothetical which

15

was almost exactly the same except for "no missed attendance and no unscheduled breaks" and "responding to work pressures goes to slight and responding appropriately to changes goes to slight." (Tr. at 60.) The VE responded that such a person could perform the 10,000 "housekeeping cleaner" jobs and the 23,000 "cashier two" unskilled jobs available in the local economy. (Tr. at 60-61.)

### F. Analysis and Conclusions

#### 1. Legal Standards

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's child disability analysis to C.J.R.'s claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

#### 2. Substantial Evidence

C.J.R. contends that substantial evidence fails to support the findings of the Commissioner. (Doc. 11.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

C.J.R. specifically contends that the "ALJ's RFC assessment and hypothetical question did not adequately address limitations imposed by C.J.R.'s mental impairments or intractable daily headaches." (Doc. 11 at 10-13.) I suggest that the ALJ's RFC assessment is supported by substantial evidence.

The ALJ expressly noted that the RFC "takes into consideration that mild-moderate pain exists despite the lack of physical and psychiatric objective findings and provides some

consideration of incidences of pain from depression. Therefore, the exertional limitation has been reduced to a light exertional workload . . . ." (Tr. at 22.) "Further, while the record does not reflect ongoing difficulties with the effects of medications used for pain or depression, the RFC provides for some limitation pertaining to mental work activities based on the possibility of side effects from medications associated with the control of depression and pain in the future." (*Id.*) In addition, the ALJ's hypothetical asked the VE to include the following mental limitations: "responding to work pressures goes to slight and responding appropriately to changes goes to slight." (Tr. at 60.)

I suggest that the record evidence supports only the ALJ's conclusion and could not support a contrary finding of disability. Although C.J.R. reported tension or nauseated headaches from 2008 onward (Tr. at 219-23, 225-28, 231-32, 250-52), there have been no clinical findings to explain the etiology of such complaints. Dr. Shin was unable to diagnose the cause of C.J.R.'s headaches, noting that the "MRI scan of the head shows normal brain parenchyma and no evidence of vascular processes." (Tr. at 273.)

Nor is there any evidence of other debilitating physical or mental impairments. Other than "early degenerative disc phenomenon from C2 to C7," all other tests were normal. (Tr. at 182-84, 192-94, 233, 259-60, 390-91.) Dr. Sanchez was unable to diagnose any cause of the abdominal pain (Tr. at 268) and Dr. Volocheck was "unclear for the underlying etiology for her episodic angioedema." (Tr. at 272.)

Furthermore, none of C.J.R.'s doctors recommended restricted activity; instead, they recommended an increase in activity. Dr. Park diagnosed daytime somnolence and he "suggested that spending too much time sleeping will also impact her sleep quality, resulting in worsening daytime symptoms" and therefore suggested that "she should be active and play with her dog or

17

otherwise." (Tr. at 266.) Even after Dr. Prestegaard recommended an in-patient evaluation for ten days and positive tender points were noted, C.J.R.'s discharge instructions contained no restrictions on activity and encouraged C.J.R. to "[g]radually resume normal activities including the physical aspects of farming." (Tr. at 392.)

With regard to mental limitations, Dr. Bhagia commented with respect to C.J.R.'s activity level, "we cannot continue to have her just sleeping most of the time and not functioning . . . ." (Tr. at 285.) In addition, Dr. Pingel stated as one of his treatment goals that C.J.R. should "[i]ncrease participation in activities of daily living including academic and employment activity" and reiterated that she should "engage more actively in educational and employment pursuits." (Tr. at 386-87.) Finally, the medical expert at the administrative hearing stated, "when I look at some of the records, for example, 7F [the mental health clinic records], she - - there's nothing in there." (Tr. at 41.) He went on to say that it "doesn't sound like she's having any real functional difficulty and then when I look at the Michigan Pain and Head Center record, the final assessment's saying that she socialized quite well with the folks there and didn't seem to have a great deal of difficulty in functioning. So it's - - hard for me to assess." (*Id.*)

The only contrasting opinion in the record before the ALJ was the opinion of Dr. Shaikh. The ALJ expressed skepticism as to whether Dr. Shaikh had "first-hand knowledge" of the tender point findings and whether Dr. Shaikh's conclusions were supported by any treatment records. I suggest that even if Dr. Shaikh is considered a proper treating source, since his opinion was based exclusively on C.J.R.'s "reports [of] subjective pain," (Tr. at 546) it is not a medical opinion entitled to deference. *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011).

I therefore suggest that the ALJ's findings and conclusion were aptly supported by substantial evidence.

### 3. Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III. REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                s/ **Charles E Binder**
                CHARLES E. BINDER
Dated: October 24, 2013          United States Magistrate Judge

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date: October 24, 2013                              By      s/Patricia T. Morris
                                                    Law Clerk to Magistrate Judge Binder